**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JOHN MURTON, for himself and all others similarly situated, | ) ) ) | CASE NO.  1:07CV3127 |
| PLAINTIFF, | ) ) ) | JUDGE SARA LIOI |
| vs. | ) ) ) | AMENDED MEMORANDUM OPINION* |
| MEASURECOMP, LLC, | ) ) ) | |
| DEFENDANT. | ) | |

This matter is before the Court upon the parties' filing of their joint memorandum in support of the fairness of the terms of the Settlement Agreement. (Doc. No. 326.) Plaintiffs have also filed a motion for attorneys' fees. (Doc. No. 330, Am. App.) The Court previously entered an Order granting conditional approval of the parties' Settlement Agreement, subject to the fairness hearing. Having conducted the fairness hearing on May 12, 2009, and the parties having been given an opportunity to file post-hearing briefs in support of the final approval of the Settlement Agreement and the award of attorneys' fees for plaintiffs' counsel, the Court is prepared to issue its final decision approving the settlement and resolving this litigation.

---

*After the Court filed its Memorandum Opinion, counsel for the parties contacted the Court to obtain clarification as to the redistribution of funds to the plaintiff class in light of the Court's decision to reduce the amount allotted to the class representations. This amended Memorandum Opinion is being filed to address the reallocation of class funds.

**I. Background**

    *A.*       *The Settlement Class and Allegations*

        Plaintiff John Murton (John Murton) is a former employee of defendant MeasureComp, LLC (MeasureComp or defendant). John Murton worked for MeasureComp as a technician, and was responsible for traveling to the homes of individuals who purchased carpet or other flooring from MeasureComp to determine the amount of material needed for the home improvement job. Plaintiff was paid for his work on a "piece rate basis," i.e., he received a flat rate for each measurement job completed.

        The parties agree that a "typical day" for a technician would:

> begin early in the morning, sometimes as early as 5 or 6 a.m. At that time, technicians would download, from the MeasureComp server, a list of jobs to be completed that day. The technician would then take the list of assigned jobs, sometimes as many as 10-15, and plot a route for the day. At 7:00 a.m., the technicians were responsible for calling all of the customers whose homes were to be measured that day in order to inform them when they expected to be at their home. After doing so, each technician uploaded his/her anticipated schedule, as well as the responses received from each customer, into the MeasureComp system. Having done so, the technicians would leave their home and begin to complete the measurement jobs for the day.

> All MeasureComp technicians completed their jobs through the use of an electronic hand-held device through which they would electronically sketch out the measurements for each house they visited. They were expected to be at the first measuring job by approximately 8:00 a.m.

> At the end of the day, after all the jobs had been completed, the technician would return to his/her home where he then had to upload the results of all of his measurement jobs to the MeasureComp system. Discovery revealed that the hand-held device recorded the time that it was turned on at a particular job (if it was turned on) and also recorded the time when the computer was turned off. The hand-held device also permitted the technician's [sic] to manual [sic] enter their work time if the device did not do so and/or the time entered was in error.  Additionally, when a technician connected to the Measurecomp system, for the purpose of

2

obtaining a list of jobs or downloading the completed measurements at the
end of the day, the time that the technician connected was recorded. […]

(Doc. No. 326, Joint Memo., pp. 2-3.) John Murton maintained that he regularly worked
in excess of forty (40) hours a week, including time at home performing tasks that were
integral to his position as a technician and driving to his first assignment and  home from
his last assignment of the day, for which he was not compensated. (*Id*. at 3.)

John Murton filed suit against MeasureComp, on his own behalf and all
those similarly situated, asserting violations of the FLSA and the Ohio Minimum Fair
Wage Standards Act, Ohio Rev. Code § 4111.01 *et seq*. (Doc. No. 1.) He alleged that
MeasureComp violated the FLSA by failing to pay overtime for work in excess of forty
(40) hours. On May 12, 2008, Todd Murton was joined as a party plaintiff. (Doc. No. 33.)

The Court conditionally certified the FLSA claim as a class action under
29 U.S.C. § 216(b) on June 9, 2008. (Doc. No. 39.) After notice was provided to over one
thousand potential members of the collective action, two hundred fifty-three (253)
individuals timely opted into the collective action. Of the original members of the
conditional class, 12 individuals accepted offers of judgment, leaving two hundred forty-
one (241) members in the class. (May 12, 2009 Fairness Hearing TR at 2.)

The parties engaged in substantial discovery, and the Court was required
to intervene during discovery to resolve various discovery-related disputes. The parties
also participated in two preliminary rounds of mediation with a private mediator
appointed by the Court, attorney Gregory Mersol.[1] The first round took place on March

---

[1] Attorney Mersol is a partner with the law firm of Baker and Hostetler, and has considerable experience in
the areas of employment law and class action litigation. (Fairness Hearing TR at 4.)

3

19, 2008. A second mediation conference was conducted on April 9, 2008, with a follow-up telephone conference, but no resolution was reached.[2] (*See* Doc. No. 326, p. 4; Doc. No. 330, p. 2.)

The Court subsequently conducted a settlement conference on January 26, 2009. At the conclusion of the conference, the parties were able to reach a tentative settlement. The settlement was reduced to writing, and the Settlement Agreement was filed with the Court on March 20, 2009, appended to the parties' joint motion to approve the settlement (Doc. No. 323, Ex. A.) Along with the motion and the written agreement, notice of the scheduled fairness hearing was sent to the class members. (*Id.*, Ex. B.)

B.       *The Terms of the Settlement Agreement*

The Settlement Agreement provides that MeasureComp would pay plaintiffs a total of $360,000.00 in exchange for a release of all claims raised by plaintiffs in this litigation. (Doc. No. 323, Ex. A.) The payments would be made in four installments spread out over a period of time. Of that amount, $160,000 represents payment in full to plaintiffs' counsel for all fees and costs incurred during the course of the litigation. The agreement also contemplates a bonus to be paid to John and Todd Murton to recognize their roles as class representatives.

Plaintiffs' counsel received written objections from four class members, and these objections were filed with the Court. (Doc. No. 324, Exs. A-D.) On May 12, 2009, the Court conducted a fairness hearing. At the hearing, counsel addressed the

---

[2] A third mediation on November 5, 2009 was mentioned in the May 12, 3009 Fairness Hearing, but was not addressed in the Joint Motion or Amended Fee Petition. (*See* Fairness Hearing TR at 3.) Suffice it to say, settlement was the result of much effort on the part of counsel, the parties, as well as neutral third-parties.

fairness and reasonableness of the settlement, as well as the merits of the four objections.[3] (*See* May 12, 2009 Minutes.) Following the hearing, the parties filed a joint memorandum setting forth their support for the fairness of the settlement. (*See* Doc. No. 326.)

## II. Approval of the Settlement

### A.        *Applicable Law*

The FLSA was enacted for the purpose of protecting all covered workers from the inequities in the workplace that result from the differences in bargaining power between employers and employees. *See Barrentine v. Arkansas-Best Freight System*, *Inc.*, 450 U.S. 728, 739 (1981). The goal of the FLSA was to ensure that each employee covered by the Act received "[a] fair day's pay for a fair day's work and would be protected from the evil of overwork as well as underpay." *Id.* at 739 (internal citation and quotations omitted.) The FLSA, therefore, provides that "[a]ny employer who violates the provisions of section 206 or 207 of this title shall be liable to the employee […] affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be […]." 29 U.S.C. § 216(b). The FLSA's provisions are mandatory and, except in two narrow circumstances are generally not subject to bargaining, waiver, or modification by contract or settlement. *Brooklyn Sav. Bank v. O'Neil*, 324 U.S. 697 (1945). The two circumstances in which the FLSA may be compromised are claims that are supervised by the Secretary of Labor pursuant to 29 U.S.C. § 216(b), and when a court reviews and approves a settlement in a private action for back wages under 29

---

[3] Though they were given notice of the hearing and an opportunity to appear, none of the objectors attended the fairness hearing.

U.S.C. § 216(b). *Lynn's Food Stores, Inc. v. United States,* 679 F.2d 1350, 1353 (11ᵗʰ Cir. 1982).

The latter exception applies to the instant case. The Court's role in this situation is comparable to that of a court in a settlement of a class action brought pursuant to Fed. R. Civ. P. 23. *Collins v. Sanderson Farms, Inc*., 568 F. Supp. 2d 714, 719 (E.D. La. 2008). "In essence, the Court must ensure that the parties are not, via settlement of the plaintiffs' claims, negotiating around the clear FLSA requirements of compensation for all hours worked, minimum wages, maximum hours, and overtime." *Id.* (citing 29 U.S.C. §§ 206, 207.) The existence of a question as to the plaintiffs' entitlement to compensation under the FLSA serves as a guarantee that the parties have not manipulated the settlement process to permit the employer to avoid its obligations under the FLSA. Thus, to ensure that the plaintiffs have not abandoned their rights under the Act, "the court must determine whether such a question, or bona fide dispute, exists." *Crawford v. Lexington-Fayette Urban County Gov't*, 2008 WL 4723399, at *3 (E.D. Ky. Oct. 23, 2008).

The Sixth Circuit has identified seven factors to guide a district court in its determination of whether a class-action settlement is fair and reasonable: "(1) the risk of fraud or collusion; (2) the complexity, expense, and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest." *Id*. at *3 (citing *UAW v. General Motors Corp*., 497 F.3d 615, 631 (6ᵗʰ Cir. 2007)). Only those factors that are relevant to the case at hand need be considered, and the court may "weigh particular factors

6

according to the demands of the case." *Redington v. Goodyear Tire & Rubber Co.*, 2008 WL 3981461, at *11 (N.D. Ohio Aug. 22, 2008) (citing *Granada Invest., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205-06 (6th Cir. 1992)).

      B.      **Analysis**

      i.      *Bona Fide Dispute*

In their joint memorandum, the parties maintain that there is a bona fide dispute over whether MeasureComp's failure to pay technicians overtime for hours worked in excess of 40 hours per week violated the FLSA. Specifically, plaintiffs assert that the time spent both "preliminary" and "postliminary" to the measurement jobs constituted intregal and indispensible work under the FLSA and, therefore, was compensable. As such, plaintiffs believe that this work, performed at the beginning and end of each work day, falls within the exception to the Portal-to-Portal Act.

The Portal-to-Portal Act, 9 U.S.C. § 254(a), modifies the FLSA, and provides that:

> No employer shall be subject to any liability or punishment under the Fair Labor Standards Act of 1938, as amended […], on account of the failure of such employer to […] pay an employee overtime compensation for or on account of any of the following activities of such employee engaged in on or after May 14, 1947 –
>
> > (1)      walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and
> >
> > (2)      activities which are preliminary to or postliminary to said principal activity or activities,
>
> which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

7

The question of whether a given activity is a "principal activity" within the meaning of the "Portal-to-Portal Act is a question of law for the Court.[4] *See Ballou v. General Electric Co*., 433 F.2d 109, 111 (1st Cir. 1970); *Dooley v. Liberty Mut. Ins. Co*., 307 F. Supp. 2d 234, 241 (D. Mass. 2004).

Plaintiffs argue that the preliminary work and postliminary work are principal activities because they trigger both the start and end of a given workday. They claim that their case is most analogous to *Dooley* in which the plaintiff insurance specialists were required to travel to an insured's location to assess damage from automobile accidents. Prior to performing the on-the-scene appraisals, the specialists performed worked at home in preparation for the on-site visit; including, reviewing emails, mapping routes, and loading equipment into their vehicles. *Dooley*, 207 F. Supp. 2d at 239. The court in *Dooley* found these tasks to be "principal activities" under the FLSA. *Id.* at 242.

MeasureComp also looks to the decision in *Dooley* to support its position that this preliminary work performed by its technicians is not a principal activity and, therefore, not compensable under the FLSA. MeasureComp notes that the court in *Dooley* determined that only some of the plaintiffs were entitled to compensation for work performed prior to leaving their homes. As to those plaintiffs, the court actually determined that the employees' homes were, indeed, their "office" for purposes of the

---

[4] Other courts have found the question to be one of fact, properly reserved for the jury. *See Blum v. Great Lakes Carbon Corp*., 418 F.2d 283, 286 (5th Cir. 1969); *Nicholas v. Chicago*, 789 F. Supp. 1438, 1441 (N.D. Ill. 1992). Regardless of how the question is ultimately treated, it remains a legitimate dispute that must be resolved.

FLSA because they performed "substantial administrative work" at their home. *Id.* at 245.

In contrast, MeasureComp maintains that its technicians do not perform "substantial administrative work" from home. Rather than being required to map their own routes, MeasureComp supplies its technicians with cross streets "which would obviate the need to plot routes." (Joint Memo., p. 8.) Further, while technicians were required to upload and download work assignments, the process only took a matter of minutes. Likewise, MeasureComp insists that confirmation calls to customers usually took less than a minute. This work, defendant insists, was merely *de minimus*, and was not compensable.

As an alternative argument, MeasureComp suggests that its technicians have been adequately compensated for all of the work they have performed because their remuneration is on a piece rate basis. More, if any overtime had been earned, defendant suggests that the rate would have been one-half the hourly rate, pursuant to 29 C.F.R. § 788.111(a), as opposed to time and one-half.

Given the uncertainty over how to apply the term "principal activity" to the unique facts surrounding this case, and whether, in fact, the payment on a piece rate basis eliminates the plaintiffs' claims entirely, the Court is satisfied that there are legitimate questions regarding coverage under the FLSA, such that there is a "bona fide dispute" that justifies settlement of plaintiffs' claims. The Court, therefore, moves on to consider the fairness and reasonableness of the Settlement Agreement, itself.

ii.        *Fair and Reasonable*

**1.        The risk of fraud or collusion.**

In the absence of evidence to the contrary, a court may presume that a negotiated settlement agreement is not the product of fraud or collusion. *See Redington*, 2008 WL 3981461 at *18 (citing *UAW*, 497 F.3d at 628); *Collins*, 568 F. Supp. 2d at 725. The Court finds no reason to disturb this presumption.

The parties engaged in extensive discovery that was, at times, contentious. The Court was required to intervene on several occasions; once to resolve a motion to compel the production of certain information (*See* Doc. No. 267, Order), and once to rule on a motion for sanctions against defendant. (*See* Doc. No. 314, Memo. and Order.) The parties thoroughly litigated the issues as they arose, including the issue of conditional certification of the class, which defendant opposed.

The settlement was the product of arm's-length, good faith negotiations. The two rounds of mediation, led by an experienced, neutral third-party mediator, did not produce a resolution, even after the mediator attempted a follow-up telephonic conference after the second round. Agreement was only reached after the parties agreed to resume settlement discussions during a conference conducted by the Court.

Under these circumstances, the Court finds no risk of fraud or collusion. *See, e.g., Collins*, 568 F. Supp. 2d at 725 (no evidence of collusion where the parties engaged in extensive discovery, and settlement was only reached after a successful mediation); *Crawford*, 2008 WL 4724499, at *6 (court may presume no fraud or collusion where parties engaged in extensive discovery, including a motion to compel

discovery). This factor weighs in favor of the fairness and reasonableness of the Settlement Agreement.

> **2.** **The complexity, expense, and likely duration of the litigation.**

This case is complex, both factually and legally. There are more than 240 plaintiffs, each with fact-intensive claims that would have required specific factual findings by a jury during the liability phase at trial. A separate determination would have to be made with respect to each technician as to the amount of time spent on compensable work.[5] The case also presented many difficult legal questions making appeal likely, regardless of which party prevailed at trial. In particular, questions regarding the application of the Portal-to-Portal Act, including the question of whether the preliminary and postliminary work constituted principal work under the FLSA, would have to be resolved.

Moreover, it is likely that, in the absence of a resolution, the litigation will continue on for some time. At the time the parties reached resolution, counsel still had yet to depose the respective class members, or brief the issue of certification. The parties also had not reached the dispositive motion stage. In fact, given that the deadline for seeking dispositive motions has already passed, it is likely that the Court would have to consider further modifying its Case Management Plan and Trial Order if the case were to continue.

---

[5] It was clear from the documentation supplied by certain objectors that the activities of each technician varied considerably. In addition, the Court noted in its Memorandum Opinion and Order granting conditional certification of the class that plaintiff John Murton also performed non-MeasureComp jobs while employed with defendant. (*See* Memo. Opinion and Order, p. 7.) The performance of non-MeasureComp jobs by any plaintiffs would obviously further complicate the calculation of individual claims.

In the event that the case survives summary disposition, a trial would likely not take place until 2010. These factors all weigh in favor of a finding of fairness.

      **3.**      **The amount of discovery completed.**

While the class members have yet to be deposed, the parties have engaged in extensive discovery. Several depositions have been taken, and tens of thousands of pages of documentation have been exchanged and reviewed. Counsel for plaintiffs and defendant have represented that they believe that the discovery engaged in to date has adequately apprised them and their clients as to all claims and potential liability.

      **4.**      **The likelihood of plaintiffs' success on the merits.**

Given the factual and legal complexity of the case, it is difficult to gauge the probability of plaintiffs' success at trial. Plaintiffs' ultimate success would first depend upon their success at the summary judgment stage, which could only be measured after the facts were fully explored through discovery and the legal arguments fully developed through briefing. In order for plaintiffs to proceed to trial, they would have to prevail on the issue of the application of the Port-to-Portal Act to their preliminary and postliminary activities, and the question of whether these activities were integral and indispensable to the principal activity of the job of a technician.

Even if plaintiffs' claims survived summary judgment, each plaintiff would still need to establish his or her entitlement to compensation under the FLSA. This would entail demonstrating, through a combination of testimony and documentation, that the class member engaged in the type and amount of work that is compensable under the Act. As to each class member, the jury will ultimately be required to make a credibility

determination, and, as the parties observe, it is impossible to predict how the jury will resolve these fact issues.

In contrast, the Settlement Agreement assures that plaintiffs will receive as much as 73% to 100% of the money to which they would be entitled to based upon the available records. (Joint Memo., p. 18.) More, plaintiffs are receiving non-monetary relief in the form of important policy changes designed to eliminate potential FLSA violations in the future that could not have been achieved by a jury award of monetary damages.[6] *See Crawford*, 2008 WL 4724499, at * 7 (underscoring the value of policy changes resulting from settlement negotiations). Given the uncertainty surrounding a possible trial in this matter, the certainty and finality that comes with settlement also weighs in favor of a ruling approving the agreement.

### 5. The opinions of class counsel, class representatives.

In evaluating the fairness of a class action settlement, it is appropriate for the Court to consider the judgment of experienced counsel. *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977). Counsel for plaintiffs and defendant, all experienced litigators in the area of FLSA class actions, join in requesting that the Court approve the settlement. The class representatives also support the proposed settlement. This factor favors of a finding that the Settlement Agreement is fair and reasonable.

### 6. The reaction of absent class members.

In light of the fact that this is an "opt-in class" action, there are no "absent class members." *See Crawford*, 2008 WL 4724499, at *8. Nonetheless, prior to the

---

[6] The parties represent that, as a direct result of the present litigation, MeasureComp has instituted policies "which have been calculated to eliminate potential FLSA violations in the future." (Joint Memo., p. 12.)

fairness hearing, all members of the opt-in class were given notice of the proposed Settlement Agreement and afforded an opportunity to express any objections to the settlement. The Court conducted its fairness hearing on May 12, 2009, at which time all class members were invited to express their views regarding the settlement. No class members appeared to voice any objections.

Prior to the hearing, however, four of the 241 remaining class members filed written objections with plaintiffs' counsel. (Doc. No. 324, Notice, Exs. A-D.) One plaintiff, Panagiotis Mazarakis, objects to his award of $248.18, maintaining that his actual work activity warrants a greater pay-out. He supports his claim with hand-written calendar notes and notebook pages that purport to reflect some 348 hours of overtime for various unspecified preliminary activities. (*Id*., Ex. A.)

Company records simply do not bear out the 2.5 hours of overtime per week that Mr. Mazarakis claims he consistently worked on a weekly basis.[7] Even if Mr. Mazarakis's weekly preliminary time exceeded the 90 minutes of time assumed by the settlement agreement, however, the 90 minute figure represents a number that was arrived at by the parties at the conclusion of good faith negotiations. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig*., 55 F.3d 768, 806 (3d Cir. 1995) (citing *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977)) ("settlement is a compromise, a yielding of the highest hopes in exchange for certainty and resolution."). Mr. Mazarakis is not entitled to a pro-rata share of the settlement, and the Court finds that his allotment is both fair and reasonable.

---

[7] For example, the parties note that Mr. Mazarakis's own records show that he only recorded 35.87 hours of work time for the week of April 10, 2008 to April 16, 2008. (Doc. No. 324, Ex. A.)

Another objector, Charles Brown, lodged his displeasure with the proposed settlement via email on April 29, 2009. (*See* Doc. No. 324, Ex. B.) In support of his objection, he offers only his W-2 forms from 2005 and 2006. (*Id.*) He complains that he has not been reimbursed for mileage, totaling $2,448.00. Reimbursement for mileage is not part of this litigation, and, therefore, is properly not addressed by the Settlement Agreement. As for his other damages, although Mr. Brown admits that he has "not been able yet to put a dollar amount" on the overtime that he is due, he estimates, without explanation, that he is owed approximately $3,000.00.[8] (*See id.*)

The parties note that Mr. Brown has already received a unilateral payment from the company of $700.00 for unpaid overtime, making his overall pay-out more than $1,000.00. Given the fact that Mr. Brown cannot demonstrate that the pay-out is unreasonable or unfair, and given the fact that the records produced at the fairness hearing support the reasonableness of his award, his objection is overruled, in part.[9]

Mr. Brown also objects to the fact that incentive awards given to John Murton and Todd Murton as class representatives are unduly disproportionate to those of other class members. The Court agrees, and this point is more fully discussed in Section III of this Memorandum Opinion.

---

[8] It is unclear from his objection whether the $2,448.00 for unpaid mileage is included in the $3,000.00 estimate. The fact that he supports his estimate with the observation that "he traveled up to 6 different Zip Codes and 3 County's [sic] in a single day" would lend support for the conclusion that the non-compensable mileage is included in his estimate. (*See id.*)

[9] It is Mr. Brown's belief that plaintiffs' counsel simply "'went by what MeasureComp felt they owed each individual, based on there [sic] records'" (Doc. No. 324, Ex. B, internal citation omitted.). As plaintiffs' counsel explained in the fairness hearing, however, counsel reviewed "tens of thousands of payroll documents" in allocating the settlement proceeds among the class members. (Fairness Hearing TR at 10.) A review of the substantial payroll records examined solely to apportion Mr. Brown's award clearly illustrates the considerable effort put in by plaintiffs' counsel on behalf of each class member. (*See* Ex. B.) Counsel noted that they also relied upon the data from the employees' hand-held computers in apportioning awards. (Fairness Hearing TR at 11.)

15

In a one page letter, Monique Adams objects to the $150.00 amount which she will receive. (*Id.*, Ex. C.) In support of her objection, she offers only her representation that she worked "a year and a half for six days a week" and her belief that she should be receiving more than $150.00. (*See id.*)

Notwithstanding Ms. Adams's belief to the contrary, company records demonstrate that Ms. Adams is not entitled to any overtime. As such, the $150.00 award represents more than she would have received if the case had gone to trial, even if the class, as a whole, had prevailed. As the Court has determined *infra*, such a pay-out is fair and reasonable.

The final objector, Kimberly Fuller, raised her objection in a two-page email dated May 1, 2009. (*Id.*, Ex. D.) Like Mr. Brown, Ms. Fuller complains that she has not been compensated for work-related mileage. Such an expense is not covered by the conditional certification. She also alleges, without supporting documentation, that there are "countless" weeks when she worked in excess of 40 hours doing preliminary and postliminary work. She underscores the fact that she is a hardworking employee, who believes that she is entitled to more than the estimated pay-out under the proposed Settlement Agreement.

Company records fail to a show a single week in which Ms. Fuller worked more than 35 hours, and she has provided absolutely no documentation that would suggest that she performed an extraordinary 5 hours of preliminary work per week. The decision to award Ms. Fuller the minimum of $150.00 was based upon a review of the available evidence, which tends to show that Ms. Fuller had no compensable overtime.

The objections of these four class members are duly noted, but the Court finds that, with the exception of Mr. Brown's objection to the incentive awards to the class representatives, they fail to raise any doubts as to the fairness or reasonableness of the agreement.

**7.      The public interest.**

There is a strong presumption in favor of settlement. *Cotton*, 559 F.2d at 1331. "If the settlement reflects a reasonable compromise over issues actually disputed, such as FLSA coverage or computation of back wages, a court may approve a settlement to 'promote the policy of encouraging settlement of litigation.' Settlement is the preferred means of resolving litigation." *Crawford*, 2008 WL 4724499, at *9 (quoting *Lynn's Food Stores, Inc*., 679 F.2d at 1353) (internal citations omitted). *See Collins,* 568 F. Supp. 2d at 720 (citing *Williams v. Nat'l Bank*, 216 U.S. 582 (1910)).

The Court has considered all of the relevant factors individually and collectively in evaluating the proposed settlement. The balance of factors weighs in favor of a finding that the Settlement Agreement, with a caveat regarding the incentive awards to class representatives discussed below, is a fair and reasonable resolution of a bona fide dispute.

**III. Approval of the Allocation of Settlement Proceeds**

The Settlement Agreement distributes the funds amongst the class members using two criteria: the amount of overtime they worked over the course of their employment with defendant, and the extent of their participation in the lawsuit. The Court finds that this allocation is fair and reasonable.

It is a court's responsibility to ensure that the distribution of the settlement proceeds is equitable. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 855 (1999). Equity does not dictate, however, that the distribution be on a pro-rata basis. *See UAW*, 497 F.3d at 628 (citing *Ortiz*, 527 U.S. at 119) ("Neither the Federal Rules of Civil Procedure nor the Supreme Court requires that settlements offer a pro rata distribution to class members; instead the settlement need only be 'fair, reasonable, and adequate.'")

According to the formula for payment to the class members, the first step in calculating each member's allotment is to review defendant's records to determine whether the class member's work weeks ever exceeded forty (40) hours. If employment records reveal that the class member never worked more than a forty (40) hour work week, the analysis is complete and the class member is awarded $150.00.

If records reveal work weeks in excess of forty (40) hours, the agreement assumes an additional 90 minutes of preliminary time per week to which a multiplier of 2.5 is applied. This figure is then multiplied by a rate that is approximately one half of the average hourly rate of pay for employees at MeasureComp[10] to reach the pay-out for the class member.

The Court finds this formula to be fair and reasonable. The pay-out to those class members who did not work more than forty (40) hour work weeks represents a windfall inasmuch as these individuals would not have recovered at trial, even if the class had prevailed on all of its claims under the FLSA. Those class members whose

---

[10] The parties calculate this figure to be $8.26, representing the fact that the employees were paid on a piece rate for their work as technicians, and would, therefore, be entitled to one-half pay for overtime. (Fairness Hearing TR at 12.)

preliminary work matched the assumed 90 minutes contemplated by the agreement receive full compensation. (Joint Memo., p. 18.) Those class members whose preliminary work was less than the assumed 90 minutes receive both full compensation and a negotiated liquidated damage assessment. (*Id.*) In short, the agreement's allocation plan appears logically designed to account for the differences in workloads performed by the various class members.

In addition, the Settlement Agreement contemplates that John Murton and Todd Murton shall receive a bonus for their roles as class representatives. Specifically, John Murton has been allocated $25,810.00 and Todd Murton has been allocated $5,000.00.

It is not uncommon for a class representative to receive a larger percentage of the settlement than other class members. *See Crawford*, 2008 WL 4724499, at *10; *see also Hopson v. Hanesbrands, Inc*., 2008 WL 3385452, at *4 (N.D. Cal. Aug. 8, 2008). Indeed, "[C]ourt's routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation." *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 145 (E.D. Pa. 2000). "Such awards reflect the additional burdens of time, exposure, risk, and expense that these plaintiffs incurred during the course of the litigation." *Crawford*, 2008 WL 4724499, *10 (citing *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 535 (E.D. Mich. 2003)).

While incentive awards to class representatives certainly serve an important role in the class action process, a court reviewing a proposed settlement should approach incentive awards that are substantially larger than those received by other class members with a healthy dose of skepticism. "If, as in this settlement, [c]lass

19

representatives receive 'special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class member whose interest they are appointed to guard.'" *Gulino v. Symbol Techs., Inc*., 2007 U.S. Dist. LEXIS 76915, at *4 (E.D.N.Y. Oct. 17, 2007) (quoting *Weseley v. Spear, Leeds & Kellogg*, 711 F. Supp. 713, 720 (E.D.N.Y. 1989)). *See Ayers v. SGS Control Servs*., 2008 U.S. Dist. LEXIS 69307, at *22 (S.D.N.Y. Sept. 8, 2009); *Stevens v. Safeway, Inc.*, 2008 U.S. Dist. LEXIS 17119, at *35-*36 (C.D. Cal. Feb. 25, 2008).

Courts look to a number of factors in deciding whether to grant named plaintiffs incentive awards, including: (1) whether the actions of the named plaintiffs protected the interests of the class members and have inured to the substantial benefit of the class members; (2) whether the named plaintiffs have assumed substantial indirect or direct financial risk; and (3) the amount of time and effort expended by the named plaintiff. *In re Southern Ohio Correctional Facility*, 175 F.R.D. 270, 275-76 (S.D. Ohio 1997).  Additional criteria may include any risk assumed by the class representative in commencing the litigation, the notoriety class representatives had to endure in being associated with the case, length of the case and the representative's personal involvement in discovery, and the representative's personal benefit derived solely from his status as a member of the class. *See id* at 276.

To determine whether any particular incentive award is excessive, district courts balance "the number of named plaintiffs receiving incentive payments, the proportion of the payments relative to the settlement amount, and the size of each payment." *Staton v. Boeing Co*., 327 F.3d 938, 977 (9th Cir. 2003). Ultimately, it is within

the district court's discretion whether to approve an incentive award to a named plaintiff. *In re Southern Ohio Correctional Facility,* 175 F.R.D. at 276.

John Murton initiated this lawsuit, and has served as the lead plaintiff from its inception. Todd Murton joined the lawsuit on May 5, 2008. The parties have failed to document, in any way, the additional burdens that John and Todd Murton have been asked to assume as class representatives. To be sure, it can be assumed that John Murton has devoted more time than any other class member to the prosecution of this lawsuit. With the assistance of counsel, he filed the initial complaint, he was present at the initial Case Management Conference, and he sought conditional class certification.[11] He also attended the settlement conference on January 26, 2009. (*See* Minutes.) The record does not demonstrate, however, that he was asked to assume any other extraordinary duties during the course of the litigation.[12]

The bare record tells the Court even less regarding Todd Murton's efforts as a class representative. There is no indication that he attended any court proceeding, participated in discovery or mediation, or undertook on any extraordinary responsibilities in the prosecution of this litigation. The only evidence that he performed any service above and beyond that of the typical class member is an affidavit that he, like his brother, provided in support of conditional certification.[13]

Where the record demonstrates that class representatives have taken on extraordinary responsibilities in the litigation, substantial awards have been approved.

---

[11] In support of certification, he supplied a two-page affidavit detailing his job duties as a technician. (Doc. No. 22, Motion for Condition Certification, Ex. 2, Affidavit of John Murton.)
[12] The Court also assumes that John Murton assisted plaintiffs' counsel in responding to written discovery requests, though this was never confirmed by counsel.
[13] *See* Doc. No. 31, Reply, Ex. 2, Affidavit of Todd Murton.

21

*See, e.g., Stevens*, 2008 U.S. Dist. LEXIS 17119, at \*36-\*37 ($20,000 and $10,000 incentive award approved where declaration clearly established substantial time expended preparing for and attending multiple depositions, reviewing transcripts, gathering and producing documents, and reviewing pleadings); *Glass v. UBS Fin. Servs., Inc.*, 2007 U.S. Dist. LEXIS 8476, at \*52 (N.D. Cal. Jan. 26, 2007 ($25,000 approved where class counsel filed a declaration attesting to the fact that the named plaintiffs were actively involved in all aspects of the action through the fairness hearing); *In re Linerboard Antitrust Litig.*, 2004 U.S. Dist. LEXIS 10532, at \*57 (E.D. Pa. June 2, 2004) ($25,000 enhancement award appropriate where record showed class representatives performed "considerable" work in advance of litigation, during discovery, and during mediation). This is true especially in circumstances where class representation has involved significant personal risk to the individual class member. *See, e.g., In re Linerboard Antitrust Litigation*, 2004 U.S. Dist. LEXIS 10532, at \*57 (class representatives jeopardized their relationship with their suppliers by virtue of their high profile role in the litigation).

However, courts have been reluctant to approve large incentive awards when the record does not support a finding that the class representative "assumed a risk or inconvenience not shared by the other class member which is of such magnitude to merit" an incentive award, and plaintiffs do not provide any evidence of "personal difficulties of consequence encountered by the Class Representative." *Ayers v. SGS Control Servs, Inc*., 2008 U.S. Dist. LEXIS 69307, at \*23 (internal citations omitted). For example, in *Ayers*, the court rejected a $20,000 award to class representatives, where the record did not support a finding that the representatives did more than assist with

discovery, sit for depositions, and fulfill other "normal obligations of class representation." *Id*. Similarly, in *Gulino*, the court rejected an unsupported $30,000 incentive award that was 200% of the amount that the most highly compensated absent class member received. 2007 U.S. Dist. LEXIS 76915, at *7.

In the present case, the total class award was $200,000.00, and the average award was $707.91.[14] John Murton received 12.9% of the total, and 3,654.94% of the average. Todd Murton received 2.5% of the total, and 706.3% of the average. There is no evidence that either class representative assumed any personal risk in undertaking this high profile role in the litigation, or any other evidence that would justify such a lopsided result. The Court does not wish to diminish the efforts of the class representatives, especially those of John Murton, in creating a fund for the benefit of a large class of individuals to remedy alleged past FLSA violations. Still, it cannot justify the disproportionately excessive awards contemplated by the proposed Settlement Agreement, based upon the record.[15] As a result, the Court shall exercise its discretion to reduce the enhanced awards. The Court finds that an award of $15,000.00 to John Murton and $3,000.00 to Todd Murton fairly and reasonably compensates the class representatives for their compensatory time and their roles in this litigation.[16]

---

[14] In addition, 53.527% (or 129 of 241) of the class received the minimum pay-out of $150.00.

[15] The Court questions whether better documentation would have satisfied such disproportionately high enhancements.

[16] The $12,000.00 that has been reduced from the negotiated awards of the class representatives shall be allocated, on a pro rata basis, across the class who received compensation for actual overtime. Those class members receiving nominal pay-outs will not share in this subsequent distribution. In addition, John and Todd Murton's pro rata distribution of this amount shall be calculated solely upon the portion of their awards representing their compensatory shares as class members.

**IV. Approval of Attorneys' Fees**

    *A.    Applicable Law*

The Settlement Agreement proposes an award to plaintiffs' counsel of attorneys' fees in the amount of $160,000.00. An attorneys' fee award must be reasonable. *See Reed v. Rhodes*, 179 F.3d 453, 471 (6th Cir. 1999) (citing *Blum v. Stenson*, 465 U.S. 886, 893 (1984)). "The starting point for determining the amount of a reasonable attorney fee is the 'lodestar' amount, which is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Imwalle v. Reliance Med. Prods., Inc*., 515 F.3d 531, 551 (6th Cir. 2008) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

After a court has determined the lodestar amount, it may make adjustments based on twelve factors:

> the time and labor required; the novelty and difficulty of the questions; the skill requisite to perform the legal service properly; the preclusion of other employment by the attorney due to the acceptance of the case; the customary fee; whether the fee is fixed or contingent; time limitations imposed by the client or the circumstances; the amount involved and the results obtained; the experience, reputation, and ability of the attorneys; the "undesirability" of the case; the nature and length of the professional relationship with the client; and awards in similar cases.

*Paschal v. Flagstar Bank, FSB,* 297 F.3d 431, 435 (6th Cir. 2002) (quoting *Blanchard v. Bergeron*, 489 U.S. 87, 91 n.5 (1989)) (numerals omitted). Although a court may find the interests of equity require adjustment to the lodestar amount, "where the party seeking the attorney fees has established that the number of hours and the rate claimed are reasonable, the lodestar is presumed to be the reasonable fee to which counsel is entitled." *Imwalle*, 515 F.3d at 552 (citing *Pennsylvania v. Delaware Valley Citizens'*

*Council for Clean Air*, 478 U.S. 546, 564 (1986)). "To justify an award of attorneys' fees, the party seeking compensation bears the burden of documenting its work." *Gonter v. Hunt Valve Co. Inc.*, 510 F.3d 610, 617 (6th Cir. 2007) (citing *Reed*, 179 F.3d at 472).

       B.      Analysis

       Plaintiffs were represented by two law firms. Through their combined efforts, more than 560 hours of work over a 19 month period was performed litigating this lawsuit. The hourly rates charged by the attorneys involved ranged from a high of $400.00 per hour to a low of $225.00 per hour. (Doc. No. 330, Ex. A-C, Affidavits of Richard C. Haber, Daniel M. Connell, and W. Craig Bashein.) Specifically, attorneys from the law firm of Haber Polk LLP estimate that they devoted in excess of 438.8 hours to the case. To get to the lodestar amount, attorneys from this firm multiplied this number by the hourly rates charged by the attorneys involved to reach a figure of $122,200.00.[17]

       Plaintiffs were also represented by the law firm of Bashein & Bashein Co., LPA. Attorney Craig Bashein devoted more than 111 hours to the litigation, which he billed at his hourly rate of $400.00. (Bashein Aff., ¶ 12.) He also directed less senior attorneys in his office to perform approximately 22.25 hours of work on the case at an hourly rate of $225.00. (*Id.*) Bashein & Bashein Co.'s total fees amount to $49,406.25.[18] (*Id.*)

---

[17] Attorney Richard Haber represents that he spent more than 100 hours on matters related to this case, and that his billing rate is $375.00 per hour. (*See* Haber Aff., ¶ 7.) Attorney Daniel Connell avers that he devoted more than 338.80 hours to this litigation at an hourly billing rate of $250.00. (*See* Connell Aff., ¶ 4.)

[18] Billing statements for Bashein & Bashein Co. reflect that attorney Craig Bashein spent only 107.50 hours working on this litigation. (*See* Doc. No. 332, Ex. 2.) In light of the concessions that plaintiffs' counsel made in reaching the agreed figure for compensation for their services, this minor discrepancy in no way casts doubt upon the reasonableness of the fees apportioned in the Settlement Agreement.

Between the two firms, the records reveal a lodestar amount of approximately $171,606.25.[19] The Court finds that counsel has provided sufficient documentation of their lodestar hours. (*See* Doc No. 332, Billing Stm.) The hourly rates are reasonable for the area, and have been accepted recently in other Ohio courts. (*See* Haber Aff., ¶ 7; Connell Aff., ¶ 4.) In addition, the time expended by plaintiffs' attorneys was reasonable given the complexity of the factual and legal issues surrounding the case. Of course, the reasonableness of the lodestar amount is further buttressed by the fact that the negotiated amount contemplated by the proposed Settlement Agreement is only $160,000.00, representing a meaningful concession on the part of plaintiffs and their counsel.

The Court finds no reason for a downward departure from the negotiated amount. The record reveals that plaintiffs' counsel expended hours for which compensation was not sought. (*See* Haber Aff., ¶ 7.) Further, the amount of time devoted to this case represented a significant investment of resources, with no guarantee of any financial return. Nor was there any guarantee that the case would be conditionally certified, or that the parties would reach a settlement. Absent certification and settlement, plaintiffs' counsel would have been forced to proceed with each case individually. Factoring in the complex factual and legal issues surrounding this case, experienced litigators would have viewed this litigation as undesirable. Given the expertise of plaintiffs' counsel in this area (*see* Haber Aff., ¶¶ 2-6; Connell Aff., ¶¶ 2-4; Bashein Aff., ¶¶ 3-10), and the favorable result obtained, the award is justified.

---

[19] This figure does not include the $6,187.51 (or $6,312.26 if reference is made to the billing statement) in costs incurred by Haber Polke LLP. (*See* Haber Aff., ¶ 9.)

**V. Conclusion**

   For all of the foregoing reasons, the joint motion for approval of the Settlement Agreement (Doc. No. 326) is **GRANTED**, in part. The Settlement Agreement is hereby **APPROVED**, as modified by this Memorandum Opinion, inasmuch as it is a fair and reasonable resolution of a bona fide dispute of the FLSA issues. All terms of the proposed settlement are **APPROVED**, with the exception that Plaintiff John Murton shall receive an award of $15,000.00 and Plaintiff Todd Murton shall receive an award of $3,000.00. Plaintiffs' amended application for attorneys' fees (Doc. No. 330) is also **GRANTED**. This case is **DISMISSED WITH PREJUDICE**. The Clerk is directed to close this file.

   **IT IS SO ORDERED**.

Dated: August 10, 2009

               _____
               **HONORABLE SARA LIOI**
               **UNITED STATES DISTRICT JUDGE**